1

2

3

4                        UNITED STATES DISTRICT COURT

5                     NORTHERN DISTRICT OF CALIFORNIA

6

7   DARCEY LEE DUNCAN,                        Case No.  23-cv-01847-JSC

8                   Plaintiff,

9         v.                                  **ORDER RE: DEFENDANTS' MOTIONS
                                             TO DISMISS**
10   COUNTY OF HUMBOLDT, et al.,              Re: Dkt. Nos. 35, 36

11                   Defendants.

12

13         Darcey Lee Duncan sues the County of Humboldt, seven County employees, and two

14   employees of the Cher-Ae Heights Indian Community of the Trinidad Rancheria for claims arising

15   from the custodial placement of her nieces.  (Dkt. No. 25.)[1]  Defendants move to dismiss Ms.

16   Duncan's claims for lack of subject matter jurisdiction and failure to state a claim.  (Dkt. Nos. 35,

17   36.)  Having carefully considered the briefing, and with the benefit of oral argument on February

18   8, 2024, the Court GRANTS the United States's motion to dismiss because Ms. Duncan has failed

19   to comply with the Federal Tort Claims Act's administrative exhaustion requirements, and

20   GRANTS the County Defendants' motion to dismiss on qualified immunity and failure to state a

21   claim grounds.

22                                   **BACKGROUND**

23         Plaintiff Duncan is the aunt of R.K and N.O., two minor tribal members of the Cher-Ae

24   Heights Community of Trinidad Rancheria.  (Dkt. No. 25 ¶¶ 8, 24, 65.)  Ms. Duncan's home was

25   tribally approved in 2016.  (*Id.* ¶ 25.)  From August 2016 to August 2021, Ms. Duncan served as

26   R.K.'s guardian.  (*Id.* ¶ 8.)  From October 2019 to June 2021, Ms. Duncan served as N.O.'s foster

27

28   _____
     [1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the
     ECF-generated page numbers at the top of the documents.

parent.  (*Id.*)

R.K. was born in July 2007 and removed from her mother's care by Humboldt County Child Welfare Services in August 2015.  (*Id.* ¶ 65.)  In August 2016, R.K. was placed in Eureka, California with Ms. Duncan, who became her legal guardian.  (*Id.* ¶ 66.)  In January 2020, R.K.'s younger brother B.D. was placed with Ms. Duncan too.  (*Id.* ¶ 72.)  In February 2021, B.D. was returned to Kaysee Duncan, R.K. and B.D.'s mother.  (*Id.* ¶¶ 29, 73.)  R.K., who wanted desperately to live with her mother, felt hurt and abandoned when her brother left.  (*Id.*)

N.O. was born in April 2018 to Selena Duncan and was brought to Ms. Duncan's home in October 2019 at 18-months old.  (*Id.* ¶ 24.)  In November 2020, Defendant Sundberg, a tribal social worker, offered Ms. Duncan respite care for N.O. and B.D., saying she had a family in mind.  (*Id.* ¶ 26.)  Ms. Duncan agreed to respite care once a month with Eve Robinson and Greg Hotz.  (*Id.* ¶¶ 27, 46.)  N.O. went to Eve and Greg's house on January 17, February 20, March 28, April 10, and May 22 of 2021.  (*Id.*)  Between January and April of 2021, Defendant Sundberg pressured Ms. Duncan to give up care of N.O. to Eve and Greg, saying "your family will just increase in size" and "they will stay in your area."  (*Id.* ¶¶ 28, 149.)

On April 15, 2021, Ms. Duncan realized Defendant Sundberg was not listed as the Indian Child Welfare Act contact for the Cher-Ae Heights Community of Trinidad Rancheria.  (*Id.* ¶ 30.)  Instead, Amy Atkins was listed as the Indian Child Welfare Act contact, but Ms. Atkins never received any notices regarding Ms. Duncan's family.  (*Id.*)  Ms. Duncan raised this issue with Defendants Bollman, Nugent, Winstead, and Miller, who are Humboldt County social workers.  (*Id.* ¶¶ 10, 12-14, 30.)  Ms. Duncan made several complaints to Defendants Bollman, Nugent, Winstead, and Miller regarding Defendant Sundberg's posturing as the Indian Child Welfare Act contact and her "efforts to mislead or conspire with [Child Welfare Services] staff" to place N.O. "with her own family friends, Eve and Greg."  (*Id.* ¶ 31.)

On April 22, 2021, Defendant Bollman requested Ms. Duncan take a mental health examination, claiming she was doing so to keep N.O. in Ms. Duncan's home.  (*Id.* ¶¶ 33-34.)  Ms. Duncan scheduled a mental health evaluation with Rita Wafler, who weeks later was contacted by an unidentified person asking why she was interfering in Trinidad Rancheria affairs.  (*Id.* ¶ 35.)

On April 25, 2021, Defendant Sundberg took R.K. to McDonalds and bought her a gift. (*Id.* ¶¶ 68, 74.)  During this trip, Ms. Duncan believes Defendant Sundberg manipulated R.K. into lying about Ms. Duncan's treatment of her.  (*Id.* ¶ 74.)  The next day, Humboldt County Child Welfare Services received a report alleging emotional abuse and general neglect of R.K. at the hands of Ms. Duncan, including "ongoing domestic violence between Darcey and her boyfriend in front of the children."  (*Id.* ¶ 75.)  Despite these allegations, Child Welfare Services never conducted a mental health evaluation of Ms. Duncan as to R.K. and allowed R.K. to stay in Ms. Duncan's home.  (*Id.* ¶ 76.)

On April 30, 2021, Ms. Wafler found Ms. Duncan to be free of mental health issues that would impair her ability to care for N.O.  (*Id.* ¶ 36.)  After Ms. Duncan forwarded her evaluation to Defendants Bollman and Sundberg, Defendant Bollman told Ms. Duncan Child Welfare Services would not "acknowledge her evaluation because they believed she was dishonest."  (*Id.* ¶ 37.)  On May 1, 2021, Defendant Bollman text messaged Ms. Duncan to attend a conference call later the same day with Child Welfare Services Resource Family Approval Supervisor Karen Hollenbeck and Defendant Norwood, a tribal social worker.  (*Id.* ¶ 38.)  On the call, Ms. Duncan was told the Tribe revoked her status as a tribally-approved home and she had to complete the Family Resource Approval process.  (*Id.*)  No explanation was offered for the revocation.  (*Id.*)  Ms. Duncan immediately signed up for Humboldt County Family Resource Approval classes through College of the Redwoods.  (*Id.*)

On May 3, 2021, Defendant Bollman told Ms. Duncan she scheduled a Placement Preservation meeting at the Child Welfare Office in Eureka, California for May 27, 2021.  (*Id.* ¶ 40.)  Defendant Bollman then requested Ms. Duncan sign an emergency placement agreement and scheduled a home visit for May 10, 2021.  (*Id.*)  This would be the first home visit conducted in the 19 months since N.O. was placed with Ms. Duncan.  (*Id.*)  Ms. Duncan signed the emergency placement agreement on May 10, 2021.  (*Id.* ¶ 41.)  Because of this emergency placement agreement, Ms. Duncan and her live-in partner were required to complete the full Resource Family Approval (County Foster Parent Program) process within 90 days or Child Welfare Services could place N.O. with Eve and Greg.  (*Id.* ¶ 42.)

United States District Court
Northern District of California

By this time, Defendants Sundberg, Miller, and Norwood had initiated through Child Welfare Services the investigation into Ms. Duncan's alleged emotional abuse of R.K.  (*Id*. ¶ 43.) Ms. Duncan believes Defendants Sundberg, Bollman, and Miller conspired together to revoke her tribally-approved-home status, "knowing that if they reported the abuse was substantiated against [Ms. Duncan] as to R.K., [Ms. Duncan] could not get approval through the County Foster Program and would lose N.O.'s placement to Eve and Greg."  (*Id*. ¶ 43.)

At the Placement Preservation meeting on May 27, 2021, Defendant Nugent informed Ms. Duncan, along with ten family members and friends, N.O. would be removed from Ms. Duncan's home in 14 days and placed with Eve and Greg, a non-Indian family, due to concerns over Ms. Duncan's mental health.  (*Id*. ¶¶ 45-46.)  Ms. Duncan, N.O.'s mother, and several other members of N.O.'s family contested the 14-day notice of removal.  (*Id*. ¶¶ 44-45.)  Defendant Nugent denied Ms. Duncan preservation services to help N.O. stay with her family.  (*Id*. ¶ 47.)  Ms. Duncan never received a proper written notice of removal with information on the grievance process or grievance appeal form, and when she asked Defendants Bollman, Nugent, Miller, and Norwood for grievance information, they ignored her.  (*Id*. ¶ 50.)

Prior to the May 2021 Placement Preservation meeting, Child Welfare Services had terminated Selena Duncan's reunification services and her visits with N.O. were decreased to once a month before they would end completely.  (*Id*. ¶ 51.)  After the May 2021 Placement Preservation meeting, Defendants Bollman, Nugent, and Sundberg bribed Selena, offering to give her six more months of reunification services with three visits a week if she agreed to place N.O. with Eve and Greg.  (*Id*.)  Selena agreed and regained services and visits despite being "on drugs" and having "finished no part of her case plan, including completing rehab."  (*Id*.)

At a May 2021 permanency hearing with Judge Hinrichs, Defendants Bollman, Nugent, and Sundberg recommended a tribal customary adoption of N.O. with Eve and Greg.  (*Id*. ¶ 53.) Ms. Duncan told her Tribe one of their members may be adopted out to a white family.  (*Id*. ¶ 54.) In response, about 30 people submitted an "Agenda Item Request" to add the issue of N.O.'s potential adoption to the Tribal Council's agenda for the upcoming Tribal Community Meeting. (*Id*.)  Defendant Sundberg's uncle, Garth Sundberg, personally denied each request in his capacity

as the sitting chairman of Trinidad Rancheria.  (*Id*.)  Between May and June 2021, Defendant Sundberg told the Tribal Council and many members of the Tribe that Ms. Duncan failed her mental health evaluation and had abused R.K.  (*Id*. ¶ 52.)

On June 2, 2021, Defendant Miller, who led the investigation into Ms. Duncan's alleged abuse of R.K., found the abuse was substantiated and determined "[t]he home environment of Darcey Duncan is a highly charged environment and additional support is needed for both R.K. and D.D."  (*Id*. ¶ 78.)  Ms. Duncan claims Defendant Miller's report "is replete with false information" and was issued in retaliation for Ms. Duncan's refusal to give up N.O. to Eve and Greg and concern over Defendant Sundberg's representations she was the Tribe's Indian Child Welfare Act designee.  (*Id*. ¶¶ 61, 81, 149.)

On June 10, 2021, N.O. was removed from Ms. Duncan's home.  (*Id*. ¶ 57.)  On June 13, 2021, Ms. Duncan received a letter saying her name was added to the California Abuse Central Index, but the letter omitted the Child Abuse Central Index Listing grievance procedures and grievance hearing form.  (*Id*. ¶ 84.)  Though Ms. Duncan had completed the College of Redwoods foster-parent training and her application for tribally-approved-home status was nearly complete, Ms. Duncan's placement on the California Abuse Central Index forced her to withdraw her application.  (*Id*. ¶ 56.)

On June 22, 2021, allegations of emotional abuse and general neglect were filed against Ms. Duncan in Humboldt Superior Court.  (*Id*. ¶ 87.)  In December 2021, Mendocino County Department of Social Services Senior Program Manager John Flammang held Ms. Duncan's California Abuse Central Index grievance hearing, and thereafter recommended the allegations of abuse against Ms. Duncan that Defendant Miller had determined were substantiated were inconclusive.  (*Id*. ¶ 90.)  On January 18, 2022, Defendant Beck, Director of the Humboldt County Department of Health and Human Services, adopted Mr. Flammang's recommendation.  (*Id*.)  As a result, Ms. Duncan's abuse listing in the Child Abuse Central Index was changed from substantiated to inconclusive.  (*Id*. ¶ 91.)

On July 16, 2021, Child Welfare Services and the Trinidad Rancheria Human Resources Department confirmed Amy Atkins, not Defendant Sundberg, was the Indian Child Welfare Act

1   designee to whom proper legal notices should be sent.  (*Id*. ¶ 83.)  On multiple court documents in

2   both N.O. and R.K.'s cases from May to July 2021, Defendant Sundberg had represented herself

3   as Trinidad Rancheria's Indian Child Welfare Act agent.  (*Id*. ¶¶ 82-83.)  On August 4, 2021, the

4   Tribe designated Defendant Sundberg as the Indian Child Welfare Act agent.  (*Id*. ¶ 63.)

5       Ms. Duncan brings 10 causes of action against Defendants: (1) constitutional violations as

6   to N.O., (2) constitutional violations as to R.K., (3) First Amendment retaliation, (4) failure to

7   prevent the constitutional violations of subordinates, (5) *Monell*-related claims, (6) violation of

8   state civil rights, (7) malicious prosecution, (8) intentional infliction of emotional distress, (9)

9   negligent infliction of emotional distress, and (10) declaratory and injunctive relief.

**DISCUSSION**

11       Pursuant to the parties' joint stipulation, the United States substituted in as party defendant

12   in place of Defendants Sundberg and Norwood, who at all times material to Ms. Duncan's

13   allegations were acting within the scope of their federal employment with Trinidad Rancheria.

14   (Dkt. Nos. 30, 34.)  Defendant United States moves to dismiss the claims against it for lack of

15   subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  (Dkt. No. 35.)  County

16   Defendants move to dismiss the complaint for failure to state a claim under Rule 12(b)(6).  (Dkt.

17   No. 36.)

18       **A.  Defendant United States**

19       Defendant United States contends Ms. Duncan has failed to satisfy the administrative

20   exhaustion requirements of the Federal Tort Claims Act, so her claims against the United States

21   must be dismissed for lack of subject matter jurisdiction.

22       "Federal courts are courts of limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of*

23   *Am.*, 511 U.S. 375, 377 (1994).  "It is to be presumed that a cause lies outside this limited

24   jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction."

25   *Id*. (cleaned up).  When, as here, the defendant's 12(b)(1) motion attacks the existence of subject

26   matter jurisdiction in fact, the Court "may consider the evidence presented with respect to the

27   jurisdictional issue and rule on that issue, resolving factual disputes if necessary."  *Thornhill Pub.*

28   *Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979).

United States District Court
Northern District of California

Under the Federal Tort Claims Act, an individual must seek administrative resolution of her tort claim against the United States before filing an action alleging the tort claim in district court. *Jerves v. United States*, 966 F.2d 517, 518 (9th Cir. 1992); *see* 28 U.S.C. § 2675(a).

> A tort claimant may not commence proceedings in court against the United States without first filing her claim with an appropriate federal agency and either receiving a conclusive denial of the claim from the agency or waiting for six months to elapse without a final disposition of the claim being made.

*Id*. at 519. The Ninth Circuit has "repeatedly held that this claim requirement of section 2675 is jurisdictional in nature and may not be waived." *Id*. (cleaned up).

Ms. Duncan fails to allege she satisfied the exhaustion requirements of the Federal Tort Claims Act. She argues "she submitted her Federal Tort Claims Act ('FTCA') Form 95, Claim for Damage, Injury or Death to the Department of the Interior on November 30, 2023." (Dkt. No. 41 at 8.) But Ms. Duncan initiated this action on April 15, 2023, seven months before submitting her claim to the Department of the Interior. (Dkt. No. 1.) Because Ms. Duncan commenced these proceedings before filing her claim, the Court lacks subject matter jurisdiction over Ms. Duncan's claims against the United States. *Munns v. Kerry*, 782 F.3d 402, 413 (9th Cir. 2015) ("The FTCA requires, as a prerequisite for federal court jurisdiction, that a claimant first provide written notification of the incident giving rise to the injury, accompanied by a claim for money damages to the federal agency responsible for the injury.").

Accordingly, Ms. Duncan's claims against the United States are DISMISSED without prejudice but without leave to amend for lack of subject matter jurisdiction. *Yagman v. Garcetti*, 852 F.3d 859, 863 (9th Cir. 2017).

**B. County Defendants**

**1. Legal Standards**

**a. Failure to State a Claim**

Dismissal under Rule 12(b)(6) "may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1121 (9th Cir. 2008) (cleaned up). For Ms. Duncan's challenged claims to survive, the complaint's factual allegations must raise a plausible right to relief. *Bell Atl.*

1    *Corp. v. Twombly*, 550 U.S. 544, 554–56 (2007).  Though the Court must accept the complaint's

2    factual allegations as true, conclusory assertions are insufficient to state a claim.  *Ashcroft v. Iqbal*,

3    556 U.S. 662, 678 (2009).  A claim is facially plausible when the plaintiff pleads enough factual

4    content to justify the reasonable inference the defendant is liable for the misconduct alleged.  *Id.*

5                                    **b.  Qualified Immunity**

6         "The doctrine of qualified immunity shields officials from civil liability so long as their

7    conduct 'does not violate clearly established statutory or constitutional rights of which a

8    reasonable person would have known.'"  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam).

9    "To be entitled to qualified immunity at the motion to dismiss stage, an officer must show that the

10   allegations in the complaint do not make out a violation of a constitutional right or that any such

11   right was not clearly established at the time of the alleged misconduct."  *Hampton v. California*,

12   83 F. 4th 754, 765 (9th Cir. 2023).  "[D]ismissal is not appropriate unless we can determine, based

13   on the complaint itself, that qualified immunity applies."  *Polanco v. Diaz*, 76 F.4th 918, 925 (9th

14   Cir. 2023) (quoting *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016)).  So, to determine

15   whether qualified immunity applies, the Court decides 1) whether the facts alleged plausibly

16   support a violation of a constitutional right and 2) whether such right was clearly established at the

17   time of the defendant's alleged misconduct.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

18   District courts may "exercise their sound discretion in deciding which of the two prongs of the

19   qualified immunity analysis should be addressed first."  *Id.* at 236.

20        "[C]learly established law [is not to be defined] at a high level of generality."  *Ashcroft v.

21   al-Kidd*, 563 U.S. 731, 742 (2011).  Instead, in deciding whether a constitutional right was clearly

22   established at the time of the alleged violation, a court must ask "whether the violative nature of

23   particular conduct is clearly established."  *Id.* (emphasis added).  "The plaintiff bears the burden to

24   show that the contours of the right were clearly established."  *Clairmont v. Sound Mental Health*,

25   632 F.3d 1091, 1109 (9th Cir. 2011).  "This inquiry, it is vital to note, must be undertaken in light

26   of the specific context of the case, not as a broad general proposition."  *Saucier v. Katz*, 533 U.S.

27   194, 201 (2001), *overruled on other grounds by Pearson*, 555 U.S. at 236.  "[W]here there is no

28   case directly on point, existing precedent must have placed the statutory or constitutional question

beyond debate." *C.B. v. City of Sonora*, 769 F.3d 1005, 1026 (9th Cir. 2014) (cleaned up). "A right is clearly established if its contours are sufficiently clear that a reasonable official would understand that what she is doing violates that right." *Kaulukukui*, 38 F.4th at 800 (cleaned up).

### 2. Sixth, Seventh, Eighth, Ninth, and Tenth Causes of Action

Ms. Duncan does not oppose dismissal of the seventh, eighth, ninth, and tenth causes of action. (Dkt. No. 40.) She also concedes the dismissal of the Unruh Act claim in her sixth cause of action. (Dkt. No. 40 at 38.) As to the remaining Bane Act claim in Ms. Duncan's sixth cause of action against all Defendants, Ms. Duncan engages in impermissible group pleading in violation of Federal Rules of Civil Procedure 8(a) and 9(b). *Gauvin v. Trombatore*, 682 F. Supp. 1067, 1071 (N.D. Cal. 1988) ("Plaintiff must allege the basis of his claim against each defendant to satisfy Federal Rule of Civil Procedure 8(a)(2), which requires a short and plain statement of the claim to put defendants on sufficient notice of the allegations against them."); *Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011) ("Rule 9(b) does not allow a complaint to lump multiple defendants together but requires plaintiffs to differentiate their allegations when suing more than one defendant." (cleaned up).).

For these reasons and the others stated on the record at the hearing, these claims are DISMISSED with leave to amend.

### 3. First Cause of Action: Constitutional Violations as to N.O.

Ms. Duncan alleges various procedural due process claims in her first cause of action. Under the Fourteenth Amendment, the government must provide due process before it deprives an individual of a liberty or a property interest. *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 19 (1978).

#### a. Count One: Tribally-Approved Home Status

Ms. Duncan accuses Defendants Bollman and Nugent of violating the Fourteenth Amendment by fabricating mental health issues that caused her to lose her status as a tribally-approved home, which then deprived her of her ability to foster N.O. (Dkt. No. 25 ¶¶ 100-102, 105.) The Amended Complaint's allegations conflict as to when Ms. Duncan's home attained tribally-approved status. Though Ms. Duncan alleges her home was tribally approved in 2016, she

also alleges Defendant Sundberg tribally approved her home on October 29, 2019.  (*Id*. ¶¶ 25, 100.)  The Tribe revoked Ms. Duncan's status as a tribally-approved home on May 1, 2021.  (*Id*. ¶ 38.)

"[N]o action under 42 U.S.C. § 1983 can be maintained in federal court for persons alleging deprivation of constitutional rights under color of tribal law.  Indian tribes are separate and distinct sovereignties and are not constrained by the provisions of the fourteenth amendment." *R.J. Williams Co. v. Fort Belknap Hous. Auth.*, 719 F.2d 979, 982 (9th Cir. 1983) (cleaned up). The Tribe revoked Ms. Duncan's home's tribally-approved status, not County Defendants.  (Dkt. No. 25 ¶ 38.)  Though the Tribe offered no explanation for its revocation, the complaint does not allege facts permitting the inference the Tribe revoked Ms. Duncan's status as a tribally-approved home under color of state law.  Moreover, Ms. Duncan does not allege County Defendants had the power to grant or revoke her home's tribally-approved status or any other facts to justify the inference County Defendants were at all responsible for the Tribe's revocation of Ms. Duncan's status as a tribally-approved home.  Drawing inferences from the allegations in favor of Ms. Duncan, her alleged injury—the loss of her status as a tribally-approved home—is not attributable to County Defendants.  So, Ms. Duncan fails to state a § 1983 claim against County Defendants for the Tribe's revocation of her status as a tribally-approved home.

Even if Defendants Bollman or Nugent were somehow involved in the revocation of Ms. Duncan's status as a tribally-approved home, County Defendants are entitled to qualified immunity because no clearly established law provides there is a Fourteenth Amendment liberty or property interest in being a tribally-approved home.  Indeed, Ms. Duncan alleges she has "a property interest in her tribally approved home status" because a tribally-approved home is "akin to a state foster care license." (Dkt. No. 25 ¶ 100.)  But she has not identified any legal authority supporting a constitutionally protected property interest in being a tribally-approved home, whether by analogy to a foster care license or otherwise.  And she has also failed to identify clearly established law recognizing a property interest in a foster care license.  *See Smith v. Organization of Foster Families for Equality & Reform (OFFER )*, 431 U.S. 816, 846 (1977) (assuming "[foster parents] have a protected 'liberty interest'"); *Joshua v. Newell,* 871 F.2d 884,

886 (9th Cir.1989) ("assume[d] without deciding that the [foster parents] had a protected property interest in their license"); *see also Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1110 (9th Cir. 2010) (noting the above cases merely assumed a protected constitutional interest). So, even if Ms. Duncan could somehow allege the County Defendants caused her to lose her status as a tribally-approved home while they were acting under color of state law, qualified immunity applies because no clearly established law recognizes a property interest in being a tribally-approved home.

### b. Count Two: Familial Association

Ms. Duncan alleges Defendants Bollman and Nugent deprived her of her First and Fourteenth Amendment right to familial association "as an Indian Custodian and/or extended-family member" without due process. (Dkt. No. 25 ¶¶ 109-127.)  In particular, she alleges the County Defendants removed N.O. from her home and placed N.O. with Eve and Greg through an alleged conspiracy involving fabrication of evidence. (*Id.* ¶¶ 40, 45-46, 57, 123-25); *see Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1107 (9th Cir. 2001) ("The Fourteenth Amendment guarantees that parents will not be separated from their children without due process of law except in emergencies.").

The First and Fourteenth Amendment protect against "unwarranted interference with the right to familial association." *Keates v. Koile*, 883 F.3d 1228, 1236 (9th Cir. 2018).  Defendants move to dismiss this claim on the grounds Ms. Duncan as a foster parent did not have a constitutionally protected interest in her continued custody of N.O. and, in the alternative, on qualified immunity grounds.

Biological and adoptive parents have a constitutionally protected liberty interest in their relationship with their children. *Smith v. Org. of Foster Fams. For Equal. & Reform*, 431 U.S. 816, 844 (1977); *see also Miller v. California*, 355 F.3d 1172, 1175 (9th Cir. 2004) ("[T]here is no question that *parents* have a constitutionally protected liberty interest in making decisions about the care, custody, and control of their children."); *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001) ("It is well established that a parent has a fundamental liberty interest in the companionship and society of his or her child and that the state's interference with that liberty

1    interest without due process of law is remediable under 42 U.S.C. § 1983."); *Mabe v. San*

2    *Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d at 1107 (9th Cir. 2001) ("The constitutional

3    right of parents and children to live together without governmental interference is well established.

4    The Fourteenth Amendment guarantees that parents will not be separated from their children

5    without due process of law except in emergencies.").

6           There is also legal support to conclude relatives who share "a long-standing custodial

7    relationship" with closely-related children that constitutes an "existing family unit" possess a

8    liberty interest in familial association with the children.  *See Osborne v. Cnty. of Riverside*, 385 F.

9    Supp. 2d 1048, 1054–55 (C.D. Cal. 2005); *Sanchez v. Cnty. of Santa Clara*, No. 5:18-CV-01871-

10   EJD, 2018 WL 3956427, at *9 (N.D. Cal. Aug. 17, 2018) (denying a motion to dismiss an

11   interference with familial association claim brought by grandparents with whom grandkids had

12   lived for a substantial amount of time such that they were an existing family unit); *Rivera v.*

13   *Marcus*, 696 F.2d 1016 (2d Cir. 1982) (holding the plaintiff had a liberty interest in preserving the

14   integrity and stability of her family given she was biologically related to the children, the plaintiff

15   and children lived together as a family for several years before the plaintiff became the children's

16   foster parent, and there was no potential conflict with the rights of the children's natural parents);

17   *see also Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494, 503-06 (1977) (holding a

18   grandmother had a fundamental right to reside with a grandchild with whom she had established a

19   long-standing custodial relationship: "[t]he tradition of uncles, aunts, cousins, and especially

20   grandparents sharing a household along with parents and children has roots equally venerable and

21   equally deserving of constitutional recognition.").

22          On the other hand, "foster parents do not enjoy the same constitutional protections that

23   natural parents do." *Backlund v. Barnhart*, 778 F.2d 1386, 1389 (9th Cir. 1985).  "Whatever

24   liberty interest might otherwise exist in the foster family as an institution, that interest must be

25   substantially attenuated where the proposed removal from the foster family is to return the child to

26   his natural parents." *Smith*, 431 U.S. at 846-47.  When "the claimed interest derives from a

27   knowingly assumed contractual relation with the State, it is appropriate to ascertain from state law

28   the expectations and entitlements of the parties." *Smith*, 431 U.S. at 845-46.

United States District Court
Northern District of California

United States District Court
Northern District of California

California law creates a protected liberty interest only if the law contains "(1) substantive predicates governing official decisionmaking, and (2) explicitly mandatory language specifying the outcome that must be reached if the substantive predicates have been met." *James v. Rowlands*, 606 F.3d 646, 656 (9th Cir. 2010). In a non-precedential 2016 opinion, the Ninth Circuit ruled California law does not establish substantive predicates or mandate any outcomes as to the removal of a foster child, and thus does not create a protected interest in pre-removal notice and grievance procedures for foster parents. *Huk v. Cnty. of Santa Barbara*, 650 F. App'x 365, 367 (9th Cir. 2016). Foster parents cannot demonstrate custody of their foster child is a protected liberty interest even if the foster parents were deprived of custody without process through deceptive means. *Id.*; *see also Ragan v. Cnty. of Humboldt Dep't of Health & Hum. Servs.*, No. 16-CV-05580-RS, 2017 WL 878083, at *6 (N.D. Cal. Mar. 6, 2017) (applying *Huk* to conclude foster parent plaintiffs failed to show their constitutional rights to familial association were clearly established).

Relatedly, "[t]he first and paramount goal of California law is the reunification of children with their natural parents." *Brown v. San Joaquin Cnty.*, 601 F. Supp. 653, 658 (E.D. Cal. 1985); *see* Cal. Welf. & Inst. Code § 396 ("It is the policy of the Legislature that . . . reunification with the natural parent or parents or another alternate permanent living situation such as adoption or guardianship is more suitable to a child's well-being than is foster care.").

> [N]o foster parent or foster child can, on the basis of California law, form the expectation of an indefinite relationship during the period when familial reunification efforts are occurring but that both foster parents and foster children are permitted by California law to expect an enduring relationship once efforts at familial reunification have been abandoned.

*Id.* at 661.

Although Ms. Duncan alleges N.O. was placed in her care by the County while N.O.'s mother was involved in reunification services, she urges her status as an extended family member and Indian custodian as defined in 25 U.S.C. 1903(6)[2] gives her a constitutionally protected

---

[2] "'Indian custodian' means any Indian person who has legal custody of an Indian child under tribal law or custom or under State law or to whom temporary physical care, custody, and control

13

1    interest in her custody of N.O. akin to that of a biological or adoptive parent.  Drawing all

2    reasonable inferences in Ms. Duncan's favor, Ms. Duncan parented N.O. since N.O. was 18

3    months old from October 2019 (when she was brought to Plaintiff's home) through June 2021

4    (when N.O. was removed); she is N.O.'s biological aunt; at the same time she was parenting N.O.

5    she was parenting two of N.O.'s biological cousins in the same home; she intended to adopt N.O.;

6    and she and N.O. are members of the same Indian tribe.  For the 20 months N.O. lived in Ms.

7    Duncan's home, Ms. Duncan "loved and cared for her . . . as a mother would care for her child."

8    (*Id*. ¶ 118.)  When N.O. arrived, Ms. Duncan quit her job so she could devote her time to caring

9    for N.O.  (*Id*.)  Ms. Duncan "put her to bed each night, read to her, taught her numbers and ABC's

10   and did all the things a loving[,] attentive parent would do."  (*Id*.)  So, not only is Ms. Duncan

11   biologically related to N.O., she and N.O. lived together as a family unit for more than half of

12   N.O.'s young life.

13           But, accepting these inferences, and assuming, without deciding, she has plausibly alleged

14   she was an Indian custodian, Ms. Duncan has not identified any "clearly established law" holding

15   her relationship with N.O. was protected by the United States Constitution.  When, as here, there

16   is no case directly on point, "existing precedent must have placed the statutory or constitutional

17   question beyond debate" to overcome qualified immunity.  *C.B.*, 769 F.3d at 1026 (cleaned up).

18   There is no such existing precedent.

19           Plaintiff focuses on *Moore*, *Rivera*, and *Osborne*, and to argue she has a clearly established

20   protected liberty interest in her relationship with N.O.  "In *Moore*, the Supreme Court invalidated,

21   on substantive due process grounds, an ordinance that applied criminal penalties to a grandmother

22   for living in the same household with her two grandsons, who were cousins."  *Khachatryan v.*

23   *Blinken*, 4 F.4th 841, 860 (9th Cir. 2021) (cleaned up); *see Moore*, 431 U.S. at 499-500

24   (invalidating ordinance forcing a grandmother "to find another dwelling for her grandson John,

25   simply because of the presence of his uncle and cousin in the same household.").  So, *Moore* says

26   nothing about whether a biological aunt whose niece is placed in her custody by the state has a

27

28   _____
     has been transferred by the parent of such child."  25 U.S.C.§1903(6).

United States District Court
Northern District of California

constitutionally protected interest in continued custody of the niece, let alone place the "question beyond debate."

In *Rivera*, the Second Circuit decided an aunt who shared a long-standing custodial relationship with her half-sister's children had a liberty interest in familial association with her half-sister's children. 696 F.2d at 1024-25. There, the aunt was related biologically to the children, they lived together as a family unit for five years before a foster care agreement was consummated, and there existed no potential conflict with the rights of the children's natural parents who had shown no interest in the children for 12 years. *Id*. at 1024. But, here, unlike in *Rivera*, N.O. was originally placed in Ms. Duncan's care as a foster parent—N.O. did not live with Ms. Duncan for any period of time before government placement. And, unlike *Rivera*, N.O.'s mother was in reunification proceedings at the times N.O. was placed in and removed from Ms. Duncan's home. From the moment it began, Ms. Duncan's custodial relationship with N.O. was conditional: she would care for N.O. until Child Welfare Services reunified N.O. and Selena Duncan. Ms. Duncan's liberty interest in familial association thus arises from her agreement with the Tribe and Child Welfare Services to foster parent N.O. until N.O.'s reunification with her mother on the County's terms. So, *Rivera* does not place the constitutional question of Ms. Duncan's constitutionally protected interest "beyond debate."

Finally, *Osborne*, a district court case, does not place Ms. Duncan's asserted liberty interest in her relationship with N.O. beyond debate. The district court merely held the plaintiff grandmother and aunt had not alleged a longstanding custodial relationship that created a family unit; instead, the plaintiffs had merely alleged a protected interest in familial association "by virtue of genetic link alone." 385 F.Supp.2d at 1055. So, the court did not consider whether closely-related foster parents, including Indian custodian foster parents, have a constitutionally protected interest in continued custody of foster children.

So, accepting Ms. Duncan's factual allegations as true, and assuming she qualified as an Indian custodian, she has not met her burden of showing her constitutional rights to familial association with N.O. are clearly established. So, qualified immunity applies to count two of the first cause of action.

15

### c.   Count Three: Judicial Deception

Ms. Duncan accuses Defendants Bollman, Nugent, and Baca of "presenting knowingly false, fraudulent, and misleading evidence to the Juvenile Court on a continuing basis for the specific purpose of removing N.O." from Ms. Duncan's care.  (Dkt. No. 25 ¶ 138.)  Defendants seek dismissal of this claim on the grounds Ms. Duncan does not have a constitutionally protected liberty interest in familial association with N.O. and, in the alternative, on qualified immunity grounds.

Parents have "a constitutional right under the Due Process Clause of the Fourteenth Amendment to be free from judicial deception and fabrication of evidence in the context of civil child custody cases."  *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1146 (9th Cir. 2021); *see also David v. Kaulukukui*, 38 F.4th 792, 800 (9th Cir. 2022) ("[P]arents and children have a right to be free from judicial deception in child custody proceedings and removal orders.").  "Judicial deception consists of either deliberate omission or affirmative misrepresentation."  *Scanlon v. Cnty. of Los Angeles*, No. 21-55999, 2024 WL 390103, at *9 (9th Cir. Feb. 2, 2024).  When a liberty interest is at stake, "deliberately fabricating evidence in civil child abuse proceedings violates the Due Process clause of the Fourteenth Amendment."  *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1108 (9th Cir. 2010).

However, as determined above, Ms. Duncan's constitutional rights to familial association with N.O. are not clearly established and therefore this claim, too, is barred by qualified immunity.

### d.  Leave to Amend Would Be Futile

All three counts of Ms. Duncan's first cause of action are premised on her having a liberty or property interest in her continued custody of N.O.  As explained above, no clearly established law recognizes that interest.  Moreover, at the hearing, Ms. Duncan's counsel reported N.O. is back with her mother Selena Duncan, which undermines any liberty interest Ms. Duncan could possibly have had in her conditional custody with N.O.  Accordingly, all three counts of the first cause of action are dismissed as barred by qualified immunity.  As amendment could not cure the non-existence of clearly established law, the dismissal is without leave to amend.  *Yagman*, 852 F.3d at 863.

1

### 4.   Second Cause of Action: Judicial Deception as to R.K.

Ms. Duncan accuses Defendants Nugent and Miller of conspiring to investigate, substantiate, and present to a juvenile court fabricated emotional abuse allegations against Ms. Duncan for her treatment of R.K. that resulted in County Defendants adding her to the Child Abuse Central Index.  (Dkt. No. 25 ¶¶ 154-55, 168-76.)  County Defendants seek to dismiss Ms. Duncan's second cause of action on qualified immunity grounds; namely, citing *Ragan v. Cnty. of Humboldt Dep't of Health & Hum. Servs.*, No. 16-CV-05580-RS, 2017 WL 878083, at *6 (N.D. Cal. Mar. 6, 2017), that Ms. Duncan did not have a clearly established constitutionally-protected interest in her legal guardianship of R.K.  *See Greene v. Camreta*, 588 F.3d 1011, 1034-35 (9th Cir. 2009), *vacated in part on other grounds*, 563 U.S. 692 (2011) (holding the right to be free from judicial deception in child custody proceedings and removal orders is clearly established where the deception results in a deprivation of a protected liberty interest); *Costanich*, 627 F.3d at 1114 ("[O]fficials who deliberately fabricate evidence in civil child abuse proceedings which result in the deprivation of a protected liberty or property interest are not entitled to qualified immunity.").

In *Ragan*, the plaintiffs—the child's former legal guardians and prospective adoptive parents—challenged the removal of their foster child as violating due process.  The district court held the plaintiffs, as legal guardians and prospective adoptive parents, had not shown they had a clearly established liberty interest in the custody of their foster child.  2017 WL 878083, at *6. Ms. Duncan's opposition does not cite any law establishing a legal guardian has a constitutionally-protected liberty interest in custody of the child; indeed, she does not even acknowledge *Ragan*. So, qualified immunity bars this claim.  And, to the extent this claim alleges the judicial deception ultimately led to N.O.'s removal, for the reasons discussed above qualified immunity bars that claim as well.

* * *

Accordingly, Ms. Duncan's second cause of action is DISMISSED without leave to amend as barred by qualified immunity.  *Yagman*, 852 F.3d at 863.

### 5.   Third Cause of Action: First Amendment Retaliation

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (cleaned up).  There are three elements of a First Amendment retaliation claim:

> [A] plaintiff must show that (1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct.

*O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016).  To prevail on a First Amendment retaliation claim, the plaintiff must show government officials would not have taken adverse action against the plaintiff absent retaliatory motive.  *Nieves*, 139 S. Ct. at 1722 ("the motive must *cause* the injury.").

Ms. Duncan alleges Defendants Bollman, Boyle, Nugent, Miller, and Baca retaliated against her for reporting Ms. Sundberg was not the Tribe's Indian Child Welfare Act agent.  (Dkt. No. 25 ¶¶ 180, 182.)  County Defendants allegedly retaliated by bringing an abuse case against Ms. Duncan as to R.K., removing N.O. from Ms. Duncan's care, charging Ms. Duncan with contempt, and placing Ms. Duncan's name on the California Abuse Central Index.  (*Id.* ¶ 185.)  Defendants move to dismiss on the grounds Ms. Duncan's complaint about Ms. Sundberg not being the Tribe's Indian Child Welfare Act agent is too trivial to support a plausible inference the complaint was a motivating factor in the alleged retaliation.  (Dkt. No. 36 at 28.)

Ms. Duncan responds she plausibly states a First Amendment retaliation claim because she "vehemently opposed" removal of N.O. on the grounds Ms. Duncan was "N.O.'s family member and would keep her connected to her Native family and culture and [Defendants] knew that the placement with the nontribal family did not comply with the ICWA placement preferences for foster family placement."  (Dkt. No. 40 at 32.)  While the complaint references Ms. Duncan's reports regarding Ms. Sundberg's "efforts to mislead or conspire with CWS staff in regards to N.O.'s placement," (Dkt. No. 25 ¶ 31), those reports are not the basis for her retaliation claim, (*id.* at ¶¶ 181, 183.)  In light of this mismatch, the Court GRANTS the motion to dismiss the retaliation claim with leave to amend.  The amended complaint should clearly identify her alleged First Amendment protected conduct and the retaliation that allegedly followed.

United States District Court
Northern District of California

1    The retaliation claim against Defendant Baca fails for an additional reason: she is Deputy

2  County Counsel for the County of Humboldt.  (Dkt. No. 25 ¶¶ 16, 58-59.)  Ms. Duncan alleges

3  Defendant Baca "initiated a malicious prosecution" against her, "present[ed] materially false

4  evidence to the juvenile court, sign[ed] court reports under penalty of perjury with no personal

5  knowledge, omit[ed] other known exculpatory evidence, [and] for[went] the requirement to make

6  active efforts to remediate the situation."  (Dkt. No. 25 ¶¶ 58-59, 187.)

7    Prosecutors enjoy absolute immunity from civil suits for damages under 42 U.S.C. § 1983

8  when engaged in activities "intimately associated with the judicial phase of the criminal process."

9  *Imbler v. Pachtman*, 424 U.S. 409, 430-31 (1976).  Absolute prosecutorial immunity extends to a

10  county counsel's quasi-prosecutorial actions in a juvenile dependency proceeding.  *Miller v.*

11  *Gammie*, 335 F.3d 889, 898 (9th Cir. 2003) (en banc), *overruled on other grounds by Sanchez v.*

12  *Mayorkas*, 593 U.S. 409 (2021) ("[T]he critical decision to institute proceedings to make a child a

13  ward of the state is functionally similar to the prosecutorial institution of a criminal proceeding.

14  The decision, therefore, is likely entitled to absolute immunity.").  However, prosecutors "have no

15  absolute immunity for their investigatory conduct" or if they "fabricate[] evidence during a

16  preliminary investigation, before [they] could properly claim to be acting as an advocate, or

17  make[] false statements in a sworn affidavit in support of an application for an arrest warrant."

18  *Beltran v. Santa Clara Cnty.*, 514 F.3d 906, 908 (9th Cir. 2008) (cleaned up).

19    Ms. Duncan insists "Baca is not entitled to absolute immunity because even though she

20  may have been engaged in activities 'intimately associated' with the judicial process, even

21  prosecutors do not enjoy absolute immunity where evidence is fabricated during a preliminary

22  investigation."  (Dkt. No. 40 at 33-34.)  But Ms. Duncan does not allege Defendant Baca falsified

23  evidence; instead, Ms. Duncan accuses Defendant Baca of using information from Defendant

24  Sundberg of which Defendant Baca had no personal knowledge to initiate proceedings against Ms.

25  Duncan.  (Dkt. No. 25 ¶ 58.)  The complaint's allegations fail to support an inference Defendant

26  Baca engaged in investigatory conduct or served the role of "investigative officer rather than that

27  of advocate" at any point in Ms. Duncan's case.  *Imbler*, 424 U.S. at 430-31.  Though Ms. Duncan

28  argues Defendant Baca knew Defendant Sundberg's information was false or at least failed to

1   confirm it was credible, the complaint fails to allege factual content to support such inferences.

2   And, in any event, prosecutors are absolutely immune from § 1983 suits for knowingly presenting

3   false or perjured testimony.  *Id.*

4         Because prosecutors enjoy absolute immunity for initiating prosecutions, and the

5   complaint only alleges Defendant Baca initiated a prosecution and performed other functions

6   intimately involved in the judicial process, Ms. Duncan fails to allege sufficient factual content to

7   overcome Defendant Baca's absolute prosecutorial immunity from § 1983 suits for damages.

8   *Beltran*, 514 F.3d at 908.  So, Ms. Duncan's third cause of action against Defendant Baca is

9   DISMISSED with leave to amend for this additional reason.

### 6.   Fourth Cause of Action: Constitutional Violations of Subordinates

11        Ms. Duncan brings § 1983 claims against Defendants Winstead and Beck for "ha[ving]

12   policies in place or in the alternative fail[ing] to put policies in place that directly cause

13   unconstitutional conduct by Child Welfare Services social workers."  (Dkt. No. 25 ¶ 194.)  Ms.

14   Duncan accuses Defendants Winstead and Beck of failing "to train their subordinates to provide

15   exculpatory evidence to 'the opposition' pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), [or]

16   to understand and follow ICWA (SB 678 (Jan. 1, 2007)), under the Welfare and Institutions

17   Code."  (*Id.* ¶ 195.)

18        Ms. Duncan's fourth cause of action is based solely on the conduct of Defendants

19   Winstead and Beck in their official capacity as Humboldt County employees.  "Section 1983

20   claims against government officials in their official capacities are really suits against the

21   governmental employer because the employer must pay any damages awarded."  *Butler v. Elle*,

22   281 F.3d 1014, 1023 n.8 (9th Cir. 2002).  Because Ms. Duncan's fifth cause of action alleges the

23   same claims against the County, Ms. Duncan's fourth cause of action is DISMISSED without

24   leave to amend as duplicative.  *M.M. v. Lafayette Sch. Dist.*, 681 F.3d 1082, 1091 (9th Cir. 2012)

25   ("It is well established that a district court has broad discretion to control its own docket, and that

26   includes the power to dismiss duplicative claims.").

### 7.   Fifth Cause of Action: *Monell*-related Claims

28        Ms. Duncan accuses the County of "establish[ing] and/or follow[ing] policies, procedures,

United States District Court
Northern District of California

customs, and/or practices" to (1) deny Indian foster parents their due process rights by failing to give adequate notice of proceedings potentially affecting those rights, (2) detain and remove children from their Indian foster parents without imminent danger of serious bodily harm, consent, prior court order, or providing adequate notice or an opportunity to be heard, (3) refuse the § 1915 placement preferences of Indian foster parents, (4) fail to return children to their foster parents "beyond a reasonable time period after the basis for detention is negated," (5) use fabricated evidence in juvenile court reports, and (6) act with deliberate indifference toward constitutional protections, the Indian Child Welfare Act, and policies of the Department of Health and Human Services.  (Dkt. No. 25 ¶ 206.)  The County seeks dismissal of Ms. Duncan's fifth cause of action on the grounds she fails to allege an underlying constitutional injury or to state with sufficient particularity how the County's policies caused any constitutional injury.

### a.   Defendants Winstead and Beck Are Not Proper Defendants

Because Ms. Duncan's fifth cause of action is a suit against the County, the claims against Defendants Winstead and Beck in their official capacity are DISMISSED without leave to amend. *Butler*, 281 F.3d at 1023 n.8.

### b.   Plaintiff Fails to State a *Monell* Claim

A municipality is liable under § 1983 only where the alleged unconstitutional conduct is the result of an official policy, pattern, or practice.  *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978).  To state a claim for municipal liability under § 1983, a plaintiff must allege: "(1) that he possessed a constitutional right of which he or she was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional rights; and (4) that the policy is the moving force behind the constitutional violation."  *Oviatt By and Through Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (cleaned up).  There can be no municipal liability without an underlying constitutional violation.  *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994).

> A *Monell* claim can proceed under three theories of municipal liability: (1) when official policies or established customs inflict a constitutional injury; (2) when omissions or failures to act amount to a local government policy of deliberate indifference to constitutional rights; or (3) when a local government official with final policy-

United States District Court
Northern District of California

making authority ratifies a subordinate's unconstitutional conduct.

*Hofer v. Emley*, No. 19-CV-02205-JSC, 2019 WL 4575389, at *14 (N.D. Cal. Sept. 20, 2019).  No matter the alleged theory, the plaintiff must plead facts showing "the policy is the moving force behind the constitutional violation."  *Dougherty v. City of Covina*, 654 F.3d 892, 900-01 (9th Cir. 2011); *see also City of Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985) ("At the very least there must be an affirmative link between the policy and the particular constitutional violation alleged.").  "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Tuttle*, 471 U.S. at 823-24.  However, policy or custom may be inferred by a policymaker's subsequent acceptance of unlawful conduct or failure to take corrective action. *McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986).

As to the second *Monell* element, Ms. Duncan alleges the County's lack of policies and training delineating the constitutional protections of Indian custodians and children under the Indian Child Welfare Act evince a custom of deliberate indifference to the constitutional rights of Indian custodians.  (*Id.* ¶¶ 211-13.)  But Ms. Duncan only offers one example of a constitutional violation to plead the County's custom of deliberate indifference: the removal of N.O. from Ms. Duncan's home.  (*Id.* ¶ 211.)  "[O]ne instance of County employees violating the constitutional rights of parents and children is insufficient to demonstrate a custom supporting *Monell* liability." *Benavidez*, 993 F.3d at 1154.

Ms. Duncan recounts one other incident from 2015, when Defendant Sundberg took R.K. from her grandmother's home and placed R.K. with a non-tribal couple.  (Dkt. No. 25 ¶ 67.)  Though Ms. Duncan alleges R.K. was removed from her grandmother's home, detained by Child Welfare Services, and placed with Defendant Sundberg's non-tribal friends and co-workers, she fails to allege facts sufficient to support the inference R.K.'s grandmother's constitutional rights were violated in this instance.  (*Id.*)  And Defendant Sundberg allegedly placed R.K. with the non-tribal couple, not the County.  (*Id.*)  While Defendant Sundberg may have "a history of using her authority as a tribal social worker to place Indian children with her friends and co-workers rather

than approved family members," Defendant Sundberg is not a County employee.  (*Id*. ¶ 68.)  Ms. Duncan alleges "County employees were negligent by failing to notice or by permitting" Defendant Sundberg to subvert the Indian Child Welfare Act, but "[m]ere negligence will not suffice to show *Monell* liability."  *Benavidez*, 993 F.3d at 1153.

"A plaintiff also might succeed in proving a failure-to-train claim without showing a pattern of constitutional violations where a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations."  *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006) (cleaned up).  Ms. Duncan alleges the County is aware "social workers remove children with no emergency circumstances and in contravention of the rights of Indian Custodians under ICWA" because

> [i]n 2018, the California Department of Justice entered into a stipulated judgment with COUNTY-DHHS, CWS which required COUNTY to contact with [National Council on Crime and Delinquency] for two years to provide training in part, culturally responsive services, training of the Welfare and Institutions Code, and in 2021 the Department of Justice determined that COUNTY had still not met it's [*sic*] obligations.

(Dkt. No. 25 ¶ 210.)  But Ms. Duncan fails to allege details sufficient to infer the relationship between this stipulated judgment and the alleged deprivation of constitutional rights of Indian custodians.

Citing *Hydrick v. Hunter*, 500 F.3d 978, 988 (9th Cir. 2007), Ms. Duncan argues "at this stage of the litigation prior to discovery it would be premature to dismiss this case."  (Dkt. No. 40 at 36.)  But *Hydrick* was vacated by the United States Supreme Court.  556 U.S. 1256 (2009) ("Judgment vacated, and case remanded to the United States Court of Appeals for the Ninth Circuit for further consideration in light of *Ashcoft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).").  Ms. Duncan must plead facts that plausibly support an inference the County has a custom, policy or practice that caused the violation of her constitutional rights.  Simply identifying 10 alleged policies—without stating facts that plausibly support an inference those policies exist—is insufficient.

So, Ms. Duncan fails to state a *Monell* claim against the County for deliberate indifference to the constitutional rights of Indian custodians under either an established-customs or failure-to-

train theory.  Accordingly, County Defendants' motion to dismiss Ms. Duncan's fifth cause of action is GRANTED with leave to amend.

### CONCLUSION

For the reasons explained above:

- The United States's motion to dismiss is GRANTED without prejudice but without leave to amend.

- County Defendants' motion to dismiss Ms. Duncan's first, second, and fourth causes in their entirety is GRANTED without leave to amend.

- Ms. Duncan's fifth cause of action as to Defendants Winstead and Beck is DISMISSED without leave to amend.

- Ms. Duncan's fifth cause of action as to Defendant County is DISMISSED with leave to amend.

- Ms. Duncan's third, sixth, seventh, eighth, ninth, and tenth causes of action are DISMISSED with leave to amend.

Any amended complaint must be filed by March 29, 2024.  An initial case management conference is scheduled for June 20, 2024 at 1:30 p.m. via Zoom video.  A joint case management conference statement is due one week in advance.

This Order disposes of Docket Nos. 35 and 36.

**IT IS SO ORDERED.**

Dated: February 29, 2024

JACQUELINE SCOTT CORLEY
United States District Judge